IBERIA, LÍNEAS AÉREAS DE ESPAÑA, S.A., demandante y recurrente, *v.* SECRETARIO DE HACIENDA, demandado y recurrido.

*Número:* RE-86-155 *Resuelto:* 1ro de febrero de 1993

58

*Antonio Rosselló Rentas*, de *Rúa & Mercado*, abogado de la parte demandante y recurrente; *Rafael Ortiz Carrión, Procurador General, Lorenzo Vilanova Alfonso, Procurador General Auxiliar*, abogados de la parte demandada y recurrida.

LA JUEZ ASOCIADA SEÑORA NAVEIRA DE RODÓN emitió la opinión del Tribunal.

I

*Hechos*

La Corporación Iberia, Líneas Aéreas de España, S.A. (en adelante Iberia) es una empresa nacional española propiedad del Instituto Nacional de Industria, que a su vez es un Organismo Autónomo de la Administración del Estado español dependiente del Ministerio de Industria. La participación del Instituto Nacional de Industria en el capital social de Iberia es de un 97%.

Iberia se dedica a la transportación de carga y de pasajeros mediante pago. Tiene tres (3) oficinas en Puerto Rico

para la venta y el despacho de boletos aéreos. El Departamento de Hacienda, por conducto del Secretario de Hacienda, conforme el antiguo Art. 290 del Código Político de 1902 de Puerto Rico, 13 L.P.R.A. sec. 443,([1]) impuso el pago de contribuciones a la propiedad mueble de Iberia en las referidas oficinas para los años 1976–1977, 1977–1978 y 1978–1979.([2]) Como consecuencia de dicha imposición contributiva, Iberia pagó dos mil novecientos noventa y un dólares con cinco centavos ($2,991.05) para el año fiscal 1976–1977, dos mil setecientos ochenta y nueve dólares con cinco centavos ($2,789.05) para el año fiscal 1977–1978 y dos mil doscientos noventa dólares con sesenta y tres centavos ($2,290.63) para el año fiscal 1978–1979. Iberia solicitó el reintegro de lo pagado en el foro administrativo, alegando que el Departamento de Hacienda carecía de facultad en ley para imponer contribuciones sobre la propiedad mueble en cuestión. Planteó que el Acuerdo sobre Transportes Aéreos entre el Gobierno de Estados Unidos de América y el Gobierno de España de 20 de febrero de 1973 (en adelante el Acuerdo), 24 U.S.T. 2103, efectivo el 3 de agosto de 1973, eximía a Iberia del pago de toda contribución.([3]) El Departamento de Hacienda rechazó los argumentos presentados por Iberia.

Subsiguientemente, Iberia presentó la demanda objeto de este caso, el 28 de julio de 1981, reclamando el reintegro de las sumas de dinero antes detalladas. Alegó que la Ley Pública Núm. 600 de 3 de julio de 1950, Cap. 446, 64 Stat. 931, que proveía para la Organización de un Gobierno

---

([1]) El citado artículo fue derogado por la Ley Núm. 83 de 30 de agosto de 1991, siendo sustituido por disposiciones similares. Véase 21 L.P.R.A. sec. 5001 y ss. Sin embargo, este cambio en nada afecta la controversia planteada que gira sobre la responsabilidad contributiva de la recurrente durante el período 1976–1979 bajo la anterior ley.

([2]) La propiedad afectada incluyó el equipo, los muebles, los enseres, las mejoras y el efectivo en dichas oficinas.

([3]) Dicho acuerdo fue enmendado mediante Protocolo suscrito el 21 de mayo de 1989. Las enmiendas efectuadas se limitaron a añadir un artículo sobre la seguridad en la aviación.

Constitucional por el Pueblo de Puerto Rico, no le permitía al Estado Libre Asociado de Puerto Rico imponerle el pago de contribuciones por ser una corporación propiedad de un Estado soberano extranjero, España. También planteó que el Acuerdo impedía la imposición de contribuciones sobre los bienes muebles que ésta poseía en sus oficinas radicadas en la Isla. Finalmente, alegó que de estar la imposición contributiva en cuestión autorizada por ley, la misma sería inconstitucional por violar la prerrogativa del Congreso de Estados Unidos para efectuar tratados y reglamentar el comercio con Naciones extranjeras.

El tribunal de instancia desestimó la demanda, concluyendo que el Estado Libre Asociado de Puerto Rico, a partir de la Constitución de 1952, tiene el poder inherente para imponer contribuciones sobre la propiedad de una corporación foránea en la que un Estado soberano extranjero tiene una participación mayoritaria. Además, basándose primordialmente en el caso *United States v. Pink*, 315 U.S. 203 (1942), concluyó que era necesario interpretar restrictivamente el Acuerdo entre España y Estados Unidos, ya que éste ponía en riesgo la autonomía fiscal del Estado Libre Asociado. A esos efectos, interpretó que dicho Acuerdo solamente prohibía las contribuciones federales.

Inconforme, Iberia presentó un recurso de revisión donde planteó la comisión de los siguientes errores:

### A. *Primer Señalamiento de Error*

Es nuestra contención que el Tribunal de Instancia cometió error de derecho en su Sentencia de 27 de febrero de 1986 cuando concluye que aún cuando el Acuerdo Sobre Transporte[s] Aéreos suscrito entre el Gobierno de España y el Gobierno de los Estados Unidos de América el 20 de febrero de 1973, 24 U.S.T. 2103[,] ... el cual obliga al Estado Libre Asociado de Puerto Rico, el mismo tiene que interpretarse restrictivamente ya que el Acuerdo puede afectar la autonomía fiscal del Estado Libre Asociado de Puerto Rico.

*B.* *Segundo Señalamiento de Error*

> Es nuestra contención que el Tribunal de Instancia cometió error de derecho en su Sentencia de 27 de febrero de 1986 al determinar que el Estado Libre Asociado de Puerto Rico puede imponer [c]ontribuciones sobre propiedad mueble de una entidad corporativa que es propiedad del Gobierno de España en contravención con las prerrogativas inherentes al Gobierno de los Estados Unidos de América en cuanto a reglamentación comercial con naciones extranjeras.

Habiendo examinado detenidamente los alegatos sometidos por las partes y los autos originales, procedemos a resolver.

Conforme a lo resuelto por el tribunal de instancia, estamos de acuerdo con que el Estado Libre Asociado tiene poder inherente para imponer el tipo de contribución en controversia. La recurrente no cuestiona esta determinación. Por lo tanto, en la presente opinión nos limitamos a examinar, a la luz del Acuerdo internacional en controversia y de la legislación congresional referente al transporte aéreo internacional, si la imposición contributiva llevada a cabo es válida.([4])

Las partes están contestes en que el Acuerdo aplica a Puerto Rico, pero no están conformes sobre la base legal que justifica dicha aplicación. Por un lado, el recurrido sostiene que el *Federal Aviation Act* de 1958 incluye a Puerto Rico como parte del territorio al cual se extiende dicha ley. 49 U.S.C. sec. 1301(31).([5]) Por otro lado, la recu-

---

([4]) Debido a la interpretación textual que hacemos del Acuerdo en la parte III de esta opinión, la cual nos lleva a concluir que las exenciones fiscales ahí contenidas no aplican al caso de autos, y debido a que dicha interpretación no interfiere de manera alguna con el *Federal Aviation Act*, 49 U.S.C. sec. 1513(b) (véase la parte IV de esta opinión), la autonomía fiscal del Estado Libre Asociado queda intacta en el presente caso. No es necesario, pues, pronunciarnos sobre la situación en que la autonomía fiscal del Estado, reconocida en *R.C.A. v. Gobierno de la Capital*, 91 D.P.R. 416 (1964), pueda verse afectada por una interpretación de un acuerdo o tratado internacional, sea esta interpretación de tipo liberal o restrictivo.

([5]) Mediante el *Federal Aviation Act*, el Congreso de Estados Unidos reglamentó muchos aspectos de la aviación civil, en parte mediante la creación de la Junta de Aeronáutica Civil y la Administración de la Aviación Federal, y además autorizó a la

rrente alega, y el tribunal a quo está de acuerdo, que si un tratado internacional no excluye expresamente a la Isla, le es aplicable. *Canales v. Pan American*, 112 D.P.R. 329, 332 (1982). Cabe señalar que el acuerdo internacional en cuestión incluye expresamente a Puerto Rico dentro de las rutas aéreas acordadas. 24 U.S.T. 2102 y 2133–2134. Véase, además, R. Serrano Geyls, *Derecho Constitucional de Estados Unidos y Puerto Rico*, San Juan, Ed. C. Abo. P.R., 1986, Vol. 1, pág. 361. Dadas estas circunstancias, es innecesario decidir cuáles fundamentos determinan su aplicación a la Isla.

El primer error planteado presenta una controversia en torno a la interpretación que debe darse al Art. 8 del Acuerdo en cuestión. Veamos las reglas de hermenéutica que la jurisprudencia ha esbozado a estos efectos.

## II

*Reglas de Hermenéutica*

■ Al enfrentarnos anteriormente a una controversia relativa a la interpretación de un tratado internacional sobre materia contributiva, adoptamos las reglas de hermenéutica o de interpretación de tratados y demás acuerdos internacionales seguidas por el Tribunal Supremo de Estados Unidos. Véase *Greig v. Srio. de Hacienda*, 86 D.P.R. 345, 351–354 (1962).

■ Un tribunal puede examinar un tratado o acuerdo internacional en cuanto se relacione al caso específico ante sí. La Rama Judicial debe interpretar los acuerdos internacionales como se interpreta un contrato privado. *Sullivan v. Kidd*, 254 U.S. 433, 439 (1921); *Rocca v. Thompson*, 223 U.S. 317, 331–332 (1912). A estos efectos, el tribunal debe mirar, en primer lugar, el texto y el con-

---

Rama Ejecutiva a suscribir el tipo de acuerdo ejecutivo en controversia en este caso. Véase 49 U.S.C. secs. 1462 y 1502.

texto del acuerdo. *Eastern Airlines, Inc. v. Floyd*, 499 U.S. 530 (1991); *Choctaw Nation v. U.S.*, 318 U.S. 423, 431–432 (1943); *Rainbow Nav., Inc. v. Department of Navy*, 911 F.2d 797, 801 (D.C. Cir. 1990); C.N. Shawcross y Beaumont, *Air Law*, 4ta ed., Londres, Ed. Butterworth, 1993, Vol. I, pár. 1–33, págs. 1–29. El significado claro y obvio del lenguaje de un tratado o acuerdo internacional controlará y tendrá preeminencia en relación con la interpretación que se le dé al documento, a menos que esto produzca un resultado que sea incompatible con la intención y expectativa de las partes. *Rainbow Nav., Inc. v. Department of Navy*, supra, pág. 801, citando a *Sumitono Shoji America, Inc. v. Avagliano*, 457 U.S. 176, 180 (1982), y a *Máximov v. United States*, 373 U.S. 49 (1963). Especialmente cuando el texto es difícil o ambiguo, debe considerarse la intención de las partes contratantes, el propósito a lograrse y las negociaciones que culminaron en el mismo. *Eastern Airlines, Inc. v. Floyd*, supra; *Máximov v. United States*, supra, pág. 54; *Factor v. Laubenheimer*, 290 U.S. 276 (1933); *Choctaw Nation v. U.S.*, supra, págs. 882–883. Si es posible se debe dar un significado razonable a todo el contenido del documento. *Sullivan v. Kidd*, supra; *Geofroy v. Riggs*, 133 U.S. 258, 270 (1890).

■ En Puerto Rico priva la norma de la interpretación liberal de los tratados y demás acuerdos internacionales.

... [É]stos deben interpretarse liberalmente, de manera que se cumplan sus propósitos y se le dé efectividad a sus disposiciones. A esos fines deben evitarse las interpretaciones restrictivas y técnicas. ... "[C]uando las disposiciones de un tratado son susceptibles de dos interpretaciones razonables, una que restringe los derechos que pueden invocarse bajo el mismo, y otra que los amplía, debe preferirse la interpretación más liberal." *Greig v. Srio de Hacienda*, supra, pág. 351, citando a *Factor v. Laubenheimer*, supra, pág. 293.[6]

---

[6] En cuanto a esta norma general, véanse, además: *Nielsen v. Johnson*, 279 U.S. 47, 51–52 (1929); *Jordan v. Tashiro*, 278 U.S. 123, 127 (1928); *Asakura v. Seattle*, 265 U.S. 332, 342 (1924), citados en *Greig v. Srio. de Hacienda*, 86 D.P.R. 345, 351 (1962); *United States v. Pink*, 315 U.S. 203, 225 (1942).

 Igualmente, hemos adoptado la regla de reciprocidad y buena fe al interpretar este tipo de acuerdo internacional. A esos efectos, hemos expresado "que las consideraciones de buena fe que deben gobernar las relaciones internacionales requieren que las obligaciones de los Estados se interpreten liberalmente de manera que se realice la intención de las partes y se logre la igualdad y la reciprocidad entre ellas". (Citas omitidas.) *Greig v. Srio. de Hacienda,* supra, pág. 351. Más específicamente aun en cuanto al tema que nos concierne, hemos dicho que los acuerdos internacionales deben interpretarse para lograr la reciprocidad y la igualdad contributiva entre sus ciudadanos. Íd., pág. 352. Sin embargo, en aras de llevar a cabo una interpretación liberal, un tribunal no debe expandir el lenguage claro de un tratado o acuerdo internacional. *Choctaw Nation v. U.S.,* supra, págs. 882–883; *Máximov v. United States,* supra, págs. 188–189. Finalmente, se debe evitar toda interpretación que conlleve la nulidad de un tratado o acuerdo internacional. "La interpretación ... que haría un tratado nulo e ineficiente no es admisible ... tiene que interpretarse de manera que tenga su efecto y no resulte en vano e ineficaz." (Traducción nuestra.) *Geofroy v. Riggs,* supra, págs. 270–271.

## III

*Interpretación del acuerdo*

Con estas reglas de hermenéutica en mente, pasemos a interpretar el Acuerdo en cuestión. El Acuerdo suscrito entre España y Estados Unidos regula el servicio aéreo y rutas aéreas entre ambos países. Entre los ángulos regulados, se encuentran la concesión y revocación de permisos operativos, la aplicación de la reglamentación relativa a la salida y entrada de aeronaves, el establecimiento de tari-

fas y la venta de transporte aéreo. La sección objeto de la presente controversia lee de la siguiente manera:

## ARTÍCULO 8

A. *Sobre la base de reciprocidad, cada Parte Contratante exonerará, en la máxima medida posible que sus leyes nacionales lo permitan,* a la empresa aérea o [e]mpresas aéreas designadas de la otra Parte Contratante de las restricciones de importación, impuestos de aduanas, impuestos de consumos, derechos de inspección *y otros impuestos o gravámenes nacionales y tasas por concepto de* combustible, lubricantes, materiales técnicos fungibles, piezas de repuesto inclusive, motores, equipo corriente, equipo terrestre, provisiones y otros artículos que hayan de usarse sólo en relación con la operación o servicios de mantenimiento y suministro de las aeronaves de las [e]mpresas aéreas de la otra Parte Contratante dedicadas al servicio aéreo internacional. Las exoneraciones estipuladas conforme a este apartado se aplicarán a los artículos:

(1) Introducidos en el territorio de una Parte Contratante por o a nombre de una de las empresas aéreas designadas de la otra Parte Contratante;

(2) Retenidos a bordo de una aeronave de la empresa aérea designada de una Parte Contratante al llegar al territorio de la otra Parte Contratante o al salir del mismo; o

(3) Embarcados a bordo de una aeronave de la empresa aérea designada de una Parte Contratante en el territorio de la otra y para ser usados en el servicio aéreo internacional; aunque estos artículos sean o no usados o consumidos totalmente dentro del territorio de la Parte Contratante que otorgue la exoneración.

B. Las exoneraciones previstas en este Artículo también se concederán en los casos en que la empresa aérea o empresas aéreas designadas de una Parte Contratante hayan concertado acuerdos con otra u otras empresas aéreas para prestar o transferir en el territorio de la otra Parte Contratante los artículos especificados en el Apartado A, siempre que dicha o dichas empresas aéreas gocen igualmente de tales exoneraciones concedidas por la otra Parte Contratante. (Énfasis suplido.) Art. 8 del Acuerdo, 24 U.S.T. 2124–2125.

El tribunal de instancia interpretó que el citado artículo, específicamente el término "nacional" que aparece en el primer párrafo, solamente eximía del pago de imposiciones contributivas federales, y no las impuestas por "esta-

dos, territorios, posesiones, colonias o cualquier otra sub-división política del Estado".(⁷)

El tribunal a quo basó esta interpretación principal-mente en las expresiones contenidas en *United States v. Pink*, 315 U.S. 203, 230 (1942), referentes a que un tratado debe interpretarse cuidadosamente para no limitar la autoridad estatal a menos que dicha interpretación sea necesaria para llevar a cabo la política pública nacional. Además, el tribunal concluyó que de no dársele una interpretación restrictiva, el Acuerdo confligiría con una sección del *Federal Aviation Act*, 49 U.S.C. sec. 1513(b), que le concedió permiso a Puerto Rico para imponer contribuciones sobre la propiedad de aerolíneas internacionales.

La recurrente, Iberia, alega: (1) que dicha interpretación va contra el propósito del Acuerdo; (2) que sería un acto fútil exonerarse mutuamente de las contribuciones federales solamente, y (3) que la interpretación restrictiva utilizada por el tribunal únicamente aplica cuando un acuerdo interfiere con materias puramente locales.

Entendemos que la actuación del Estado Libre Asociado al imponer contribuciones sobre los bienes muebles de Iberia no conflige con el Acuerdo en cuestión. Coincidimos con la conclusión del tribunal de instancia, aunque por otros fundamentos.

█ El texto del Art. 8(A) del Acuerdo, *supra*, es claro. Las exenciones provistas no incluyen ni el tipo de contribución impuesta en este caso (*i.e.*, contribución sobre propiedad mueble) ni el tipo de artículos sobre el que se impuso (*i.e.*, bienes muebles localizados en oficinas de venta

---

(⁷) El citado pasaje leería, conforme la interpretación del ilustrado tribunal de instancia, de la siguiente manera:

"Sobre la base de reciprocidad, cada Parte Contratante exonerará, en la máxima medida posible que sus leyes *federales* lo permitan, a la [e]mpresa aérea o [e]mpresas aéreas designadas de la otra Parte Contratante de las restricciones de importación, impuestos de aduanas, impuestos de consumo, derechos de inspección y otros impuestos o gravámenes *federales* y tasas ...." (Énfasis suplido.)

de boletos, incluyendo equipo, muebles, enseres, mejoras y efectivo).

El Art. 8(A), *supra*, provee específicamente para la exención de "restricciones de importación, impuestos de aduanas, impuestos de consumos, derechos de inspección". El tipo de contribución sobre propiedad mueble impuesta en el presente caso obviamente no fue incluida entre las partidas específicas del articulado. Por otro lado, se podría argumentar que la contribución en controversia está incluida dentro de la frase general "y otros impuestos o gravámenes nacionales y tasas". Íd. De terminar ahí la frase, no hay duda que incluiría las contribuciones sobre la propiedad en general. Solamente faltaría definir el término "nacionales" para decidir si la exención es a nivel federal, estatal o ambos. Sin embargo, esta frase está necesariamente cualificada y limitada por las palabras que le siguen: "por concepto de combustible, lubricantes, materiales técnicos fungibles, piezas de repuesto inclusive, motores, equipo corriente, equipo terrestre, provisiones y otros artículos que hayan de usarse sólo en relación con la operación o servicios de mantenimiento y suministro de las aeronaves".[8] Íd. De entenderse que la contribución sobre la propiedad está incluida en la frase "y otros impuestos o gravámenes nacionales y tasas" (íd.), lo estaría solamente con relación a los mencionados artículos. No se necesita argumentar extensamente para concluir que el tipo de equipo que se encuentra en una oficina para la venta y despacho de boletos no es del tipo contemplado en este articulado.

El único artículo enumerado en el Art. 8(A) del Acuerdo, *supra*, que posiblemente podría incluir el tipo de propiedad

---

[8] La fraseología utilizada en la versión en inglés abona la misma conclusión: "and other national duties and charges on fuel, lubricants, consumable technical supplies, spare parts including engines, regular equipment, ground equipment, stores, and other items intended for use solely in connection with the operation or servicing of aircraft...." Art. 8 del Acuerdo, 24 U.S.T. 2107. Tanto el texto en inglés como en español, pueden considerarse igualmente auténticos. Art. 16 (24 U.S.T. 2131).

afectada en este caso es "equipo corriente" (*regular equipment* en la versión en inglés). En "equipo corriente" se podría entender comprendido el equipo corriente de oficina afectado en este caso. Sin embargo, debido al contexto en que se menciona "equipo corriente" en el citado Art. 8 es muy dudoso que este término incluya el equipo de oficina. Los demás términos que rodean el uso de esta frase indican que se refiere al equipo relacionado a la operación, mantenimiento y suministro de aeronaves, tales como los "combustibles, lubricantes, materiales técnicos fungibles, piezas de repuesto inclusive motores ... equipo terrestre, provisiones". Íd.

Debido a la interpretación textual y contextual que antecede, no es necesario definir el término "nacional", utilizado en el Art. 8 del Acuerdo, *supra*, para resolver el presente caso.[9] Sea a nivel federal, estatal o ambos inclusive, el tipo de contribución y el tipo de propiedad en controversia en este caso no están cobijados por las exenciones contenidas en el Acuerdo.

La presente interpretación no es restrictiva, sino que surge del claro texto y contexto del documento en cuestión. Las reglas de hermenéutica guían a considerar en primera instancia el texto y contexto de un acuerdo. La recurrente, a base de la norma general de interpretación liberal de los acuerdos y tratados internacionales, no puede pretender que inventemos palabras donde no las hay. Contrario a la posición de Iberia, la intención de las partes no

---

[9] Sin embargo, es necesario notar que la interpretación del tribunal de instancia, según la cual "nacional" equivale a "federal", atenta contra la buena fe y reciprocidad que guía la interpretación de los tratados y acuerdos ejecutivos. Véase *Greig v. Srio. de Hacienda*, supra, pág. 351. Esto, porque tanto a la fecha en que se suscribió el Acuerdo como cuando se efectuaron dos de las tres imposiciones contributivas en el presente caso, específicamente para los años 1976–1977 y 1977–1978, el Gobierno de España no contaba con una estructura federalista. No fue sino hasta el 29 de diciembre de 1978 cuando se hizo efectiva la presente Constitución española, que erigió un sistema federalista de Gobierno en España. Véase *Modern Legal Systems Cyclopedia*, Nueva York, Ed. Law Publisher, 1989, Vol. 4, Parte 1, Secs. 1.6(A), 1.6(D), 1.1(E)(5), págs. 4.160.16, 4.160.17 y 4.160.11.

fue el eximirse mutuamente de todos los impuestos y gravámenes. Si tal hubiera sido su intención, ¿por qué no lo expresaron? ¿Por qué procedieron a especificar el tipo de exención contributiva y el tipo de artículo exento en vez de incluir una exención general y total? Además, el Art. 7 del Acuerdo permite a las partes expresamente "imponer o permitir que se impongan tarifas justas y razonables por el uso de aeropuertos públicos y de las instalaciones y servicios de ayuda a la navegación". 24 U.S.T. 2123. El texto claro del Acuerdo demuestra que la intención de las partes no fue el eximir de las contribuciones, fueran federales o estatales, el tipo de propiedad mueble afectada en este caso. No podemos inventar y editar el texto del articulado cuando éste es claro.

## IV

*Política federal con relación a la imposición contributiva estatal sobre el comercio aéreo internacional*

▄▄▄ Como segundo error, Iberia alega que la actuación del Estado al imponer contribuciones sobre su propiedad mueble viola la Cláusula de Comercio internacional. El Art. I, Sec. 8, Cl. 1, Const. EE. UU., L.P.R.A., Tomo 1, ed. 1982, pág. 173, en parte dispone que "[e]l Congreso tendrá facultad ... [p]ara reglamentar el comercio con naciones extranjeras". Aunque este poder recae, en primera instancia, sobre el Congreso, no es exclusivo y puede ser delegado. 1 *Treatise on Constitutional Law: Substance and Procedure* Sec. 6.8 (1992). La mejor prueba de que este poder no es exclusivo surge del análisis desarrollado jurisprudencialmente para determinar la validez de las contribuciones estatales sobre el comercio internacional. Específicamente, Iberia argumenta que la contribución estatal impuesta en este caso no cumple con los seis (6) requisitos exigidos a tenor con dicho análisis, a saber: (1) que exista un nexo sustancial entre la actividad sujeta a la contribu-

ción y el Estado que impone la misma; (2) que la contribución esté distribuida o proporcionada equitativamente; (3) que la contribución en cuestión no discrimine contra el comercio interestatal; (4) que la contribución esté relacionada apropiadamente con los servicios provistos por el Estado; (5) que no exista el riesgo de imposiciones contributivas múltiples a nivel internacional, y (6) que la contribución no impida que el Gobierno federal se exprese con "una voz" al regular las relaciones comerciales con Naciones extranjeras. *Wardair Canada v. Florida Dept. of Revenue*, 477 U.S. 1 (1986); *Japan Line, Ltd. v. County of Los Angeles*, 441 U.S. 434 (1979).([10])

■ Sin embargo, el análisis señalado por la recurrente es inaplicable al presente caso. El referido análisis solamente aplica cuando el Congreso no ha actuado afirmativamente, cuando ha quedado silente en determinada área, activándose así lo que tradicionalmente se llama "Cláusula de Comercio durmiente".([11]) *Wardair Canada v. Florida Dept. of Revenue*, supra, pág. 10. En el presente caso, sin embargo, el Congreso ha permitido afirmativamente la imposición de contribuciones estatales sobre la propiedad de aerolíneas internacionales (como Iberia) mediante el *Airport Development Acceleration Act* de 1973,

---

([10]) En *Wardair Canada v. Florida Dept. of Revenue*, 477 U.S. 1 (1986), se sostuvo la imposición contributiva del estado de Florida sobre la venta de gasolina utilizada en la aviación internacional a base de las actuaciones del Gobierno de Estados Unidos a nivel internacional. En *Japan Line, Ltd. v. County of Los Angeles*, 441 U.S. 434 (1979), se declaró inconstitucional una ley de California que imponía contribuciones sobre la propiedad a unas compañías japonesas dedicadas al transporte de carga en el comercio marítimo internacional por incumplir con el quinto requisito mencionado.

([11]) Dado que el análisis señalado no aplica al presente caso, es innecesario pronunciarnos sobre la aplicabilidad de la Cláusula de Comercio al Estado Libre Asociado de Puerto Rico. Véase *R.C.A. v. Gobierno de la Capital*, 91 D.P.R. 416, 431 (1964); *Gómez Hnos., Inc. v. Srio. de Hacienda*, 114 D.P.R. 367, 370 (1983); *South P.R. Sugar Corp. v. Com. Servicio Público*, 93 D.P.R. 12, 15 (1966); *Banco Popular de Puerto Rico v. Mun. de Mayagüez*, 126 D.P.R. 653 (1990).

*Japan Line, Ltd. v. County of Los Angeles*, supra, contrario a la posición de Iberia, no aplica al presente caso en cuanto a su conclusión, ya que trata del transporte marítimo internacional y no aéreo, y porque se resolvió bajo la Cláusula de Comercio durmiente internacional.

según enmendado en 1982 (49 U.S.C. sec. 1513), cuyo texto pertinente dispone:([12])

*Prohibición; exención*
(a) Ningún estado (o subdivisión política de dicho estado, incluyendo el Estado Libre Asociado de Puerto Rico, Islas Vírgenes ...) impondrá o recaudará una contribución, tarifa, "head charge", u otra carga, directa o indirectamente, sobre las personas que viajan en el comercio aéreo o sobre el transporte de personas que viajan en el comercio aéreo o sobre la venta de la transportación aérea o sobre los ingresos brutos devengados.

*Contribuciones y gravámenes estatales permisibles*
(b) Nada en esta sección prohibirá a un estado ... incluyendo al Estado Libre Asociado de Puerto Rico ... imponer o recaudar contribuciones que no estén enumeradas en la subsección (a) de esta sección *incluyendo contribuciones sobre la propiedad,* contribuciones sobre ingresos, contribuciones de franquicia, y contribuciones sobre la venta o uso de bienes o servicios .... (Traducción nuestra y énfasis suplido.)

Para comprender cabalmente el significado de la sección citada, es necesario un poco de historia. En 1970, el Gobierno federal, mediante legislación, se comprometió a asistir a los Gobiernos estatales para lograr el mejoramiento del sistema de transportación aérea. A esos efectos, se aprobó el *Airport Travel Airway Development Act* de 1970, Pub.L. No. 91-258, 84 Stat. 219. El Congreso procedió a establecer el *Airport and Airway Trust Fund* con el propósito de canalizar recursos federales hacia proyectos estatales de expansión y mejoramiento de aeropuertos. Originalmente, este fondo recibía sus ingresos de varias contribuciones federales sobre la aviación como, por ejemplo, sobre la venta de boletos, pasajeros y carga. Como consecuencia de la creación de este fondo federal y del riesgo de imposición contributiva múltiple, surgió una gran incertidumbre con relación a la autoridad estatal para imponer

---

([12]) Al momento de imponerse las contribuciones en controversia, aún no se habían efectuado las enmiendas de 1982. El texto relevante de los incisos (a) y (b) quedó prácticamente inalterado.

contribuciones. Véase *Aloha Airlines, Inc. v. Director of Taxation*, 464 U.S. 7, 8–9 (1983).

En 1972 (un año antes de suscribirse el Acuerdo en cuestión) por razón de las expresiones del Tribunal Supremo de Estados Unidos en *Airport Authority v. Delta Airlines*, 405 U.S. 707 (1972),[13] el Congreso celebró unas vistas con relación al tema en cuestión. En este proceso legislativo, el Congreso concluyó que el aumento en la imposición de contribuciones locales interfería con el transporte aéreo, presentando un riesgo de imposición de contribuciones múltiples. *Aloha Airlines, Inc. v. Director of Taxation, supra*, pág. 13. Las vistas celebradas culminaron en la inclusión de la sec. 1513 al *Airport Development Acceleration Act* de 1973.[14]

Al interpretar la relación entre los incisos (a) y (b) de la Sec. 1513, en *Aloha Airlines, Inc. v. Director of Taxation, supra*, se dijo que no se veía ninguna paradoja entre las secs. 1513(a) y 1513(b). La sec. 1513(a) prohíbe (*preempts*) un número limitado de contribuciones y cargas estatales, incluyendo las contribuciones de ingreso bruto (*gross receipts taxes*), sobre la venta de transportación aérea o el transporte de personas viajando en el comercio aéreo. De otra parte, la sec. 1513(b) clarifica la visión del Congreso de la contribución que los estados todavía pueden imponer sobre las aerolíneas y porteadores aéreos, o sea, "otras contribuciones que no estén enumeradas en la subsección a", tales como *contribuciones sobre la propiedad. Aloha Airlines, Inc. v. Director of Taxation*, supra, pág. 12.[15]

---

[13] En este caso se reconoció la autoridad estatal para imponer contribuciones al amparo de la Cláusula de Comercio y de la ley federal en general.

[14] Se celebraron unas vistas con relación al S. 2398 ante el Subcomité de Aviación del Comité de Comercio del Senado, 92d Cong., 2d Ses. 129–198 (1972); Vistas sobre H.R. 2337 ante el Subcomité de Transportación y Aeronáutica del Comité de Comercio Interestatal e Internacional de la Cámara de Representantes, 92d Cong., 2d Ses. (1972).

[15] En *Aloha Airlines, Inc. v. Director of Taxation*, 464 U.S. 707 (1972), se decidió que una contribución impuesta por el estado de Hawaii sobre el ingreso anual bruto de las aerolíneas que operaban dentro del estado estaba prohibida por el len-

El texto inicialmente propuesto de la sec. 1513 prohibía totalmente cualquier imposición contributiva estatal sobre la transportación aérea, fuera esta imposición directa o indirecta. Los estados levantaron fuertes críticas contra esta prohibición, ya que impedía a los estados sufragar los gastos de mantenimiento de sus aeropuertos. En respuesta, miembros del Congreso aseguraron que se clarificaría la intención del proyecto de ley a esos efectos. *Wardair Canada v. Florida Dept. of Revenue*, supra, pág. 15, citando las vistas sobre S. 2398, 92d Cong., 2d Ses., págs. 101, 138, 151 y 157.

El presente texto de la sec. 1513 es el producto final tras la deliberación congresional sobre cuál debería ser el rol estatal en la imposición contributiva sobre el comercio aéreo. Como surge del claro texto de dicha sección, los estados aún pueden imponer contribuciones sobre la propiedad.

El tipo de imposiciones contributivas que el Congreso decidió permitirle a los estados en el área de la transportación y comercio aéreo se extiende al área internacional. La definición estatutaria de "comercio aéreo" según el *Federal Aviation Act* de 1958, incluye "el comercio aéreo interestatal, de ultramar o internacional". (Traducción nuestra.) 49 U.S.C. sec. 1301(4). Similarmente, la definición de "transportación aérea" incluye "la transportación aérea interestatal, de ultramar o internacional". (Traducción nuestra.) 49 U.S.C. sec. 1301(10). Además, el propio texto de la ley en cuestión y su historial legislativo demuestran que el Congreso tuvo la intención y era consciente de que la ley cubriría el comercio aéreo internacional. El Departamento de Estado y el Consejo Legislativo del Senado le advirtieron al Congreso que el término "comercio aéreo", según utilizado a través del pro-

---

guaje expreso de 49 U.S.C. sec. 1513(a). La contribución en cuestión no se pudo salvaguardar a base del argumento de haber sido creada "al estilo" de una contribución sobre la propiedad, que sí es permitida bajo 49 U.S.C. sec. 1513(b).

yecto de ley, incluía el comercio internacional y de ultramar. *Wardair Canada v. Florida Dept. of Revenue*, supra, pág. 15. Además, el Congreso expresamente consideró el efecto que tendrían los *head taxes* internacionales. Íd.([16])

En este sentido, estamos de acuerdo con la opinión concurrente del Juez Burger en *Wardair Canada v. Florida Dept. of Revenue*, supra, donde expuso que un análisis del texto del *Airport Development Acceleration Act* de 1973, del *Federal Aviation Act* y de sus historiales legislativos, es suficiente para concluir que el Congreso, en el área del comercio aéreo *internacional*, ha autorizado expresamente a los estados la imposición de las contribuciones incluidas en la sec. 1513(b) de dicho estatuto, incluyendo las contribuciones sobre la propiedad.

En el citado caso, la opinión mayoritaria, sin embargo, cuestionó si el Congreso, al aprobar la sec. 1513(b) en cuestión, consideró el tráfico aéreo internacional. A esos efectos, la opinión mayoritaria expresó que "es de seguro posible, que el Congreso nunca consideró si los estados podrían imponer contribuciones de venta sobre los porteadores extranjeros, en lugar de sobre los domésticos". (Traducción nuestra.) *Wardair Canada v. Florida Dept. of Revenue*, supra, pág. 9. En vez de limitar su análisis a los estatutos federales aplicables, la mayoría procedió a dilucidar si las actuaciones del Congreso, a nivel internacional, autorizaban la imposición contributiva estatal en controversia. A esos efectos, el Tribunal consideró: (1) el *Chicago Convention on International Civil Aviation*, que es la génesis del tipo de acuerdo bilateral sobre transporte aéreo en cuestión; (2) una resolución de la Organización sobre la Aviación Civil Internacional (*International Civil Aviation Organization*), y (3) numerosos acuerdos bilaterales suscritos

---

([16]) En *Wardair Canada v. Florida Dept. of Revenue*, supra, pág. 15, el Tribunal citó las vistas sobre proyecto S. 2398 ante el Subcomité de Aviación del Comité de Comercio del Senado, 92d Cong., 2d Ses., pág. 136 (1972); vistas sobre H.R. 2337, ante Subcomité de Transportación y Aeronáutica, 92d Cong., 2d Ses., págs. 35–37 (1972).

entre Estados Unidos y Naciones extranjeras referentes a la aviación internacional. El Tribunal concluyó que lo más que estos documentos internacionales demostraban era la existencia de una meta internacional de eliminar todos los impedimentos al tráfico aéreo internacional, pero que en realidad, "la ley vigente al presente acepta la imposición contributiva sobre la venta de gasolina por las subdivisiones políticas de los países". (Traducción nuestra.) *Wardair Canada v. Florida Dept. of Revenue*, supra, pág. 11.

La aplicación del análisis de fuentes internacionales utilizado por la posición mayoritaria en *Wardair Canada v. Florida Dept. of Revenue*, supra, nos lleva a concluir que el Congreso de Estados Unidos ha autorizado el tipo de contribución impuesta en el presente caso.

■ La génesis del Acuerdo ejecutivo en controversia fue el convenio multilateral titulado *Chicago Convention on International Civil Aviation*, suscrito el 7 de diciembre de 1944, T.I.A.S. 159 (61 Stat. 1180), sobre un "convenio multilateral".([17])

El propósito tras este convenio multilateral es el siguiente:

> Considerando que el desarrollo mutuo de la aviación civil internacional puede ayudar grandemente a crear y preservar la amistad y entendimiento entre las naciones; pero que su abuso puede ser un riesgo a la seguridad general; y;
> Considerando que es deseable evitar la fricción y promover la cooperación entre las naciones y las personas sobre la cual depende la paz mundial;
> Por consiguiente, los gobiernos suscribientes han acordado ciertos principios y medidas para que la aviación civil internacional se desarrolle de manera segura y ordenada y para que los servicios de transporte civil internacional se establezcan sobre una base de igualdad de oportunidades y se operen sanamente y económicamente .... (Traducción nuestra.) 3 *Bevan's*

---

([17]) El Acuerdo en cuestión, entre Estados Unidos y España, expresa en su preámbulo que "El Gobierno de Estados Unidos de América y el Gobierno de España ... siendo parte del Convenio sobre Aviación Civil Internacional ... han acordado lo siguiente". 24 U.S.T. 2120.

*Treaties and other Agreements of the United States of America 1776–1949* 944 (1969).

Entre las áreas reglamentadas por este convenio multilateral se encuentra el vuelo sobre el territorio de otra Nación, nacionalidad de las aeronaves, accidentes, condiciones de las aeronaves y la creación de la Organización sobre la Aviación Civil Internacional (*International Civil Aviation Organization,* en adelante I.C.A.O.). Mediante este convenio multilateral, los países signatarios se comprometieron a adoptar medidas para facilitar y expeditar la navegación aérea internacional.

Por otro lado, el Art. 24(a) del convenio multilateral establece que la "gasolina, aceites lubricantes, piezas de repuesto, equipo regular y tiendas a bordo de una aeronave (*aircraft stores*) de un Estado contratante, *al llegar al territorio de otro Estado contratante y ser retenido a bordo*, al partir de dicho territorio será exento de impuestos de aduana, tarifas de inspección *o cargas y tarifas nacionales o locales similares*". (Traducción nuestra y énfasis suplido.) *Bevan's,* supra, pág. 950. Por otro lado, el Art. 15 del citado convenio dispone que "ninguna tarifa, derechos, u otras cargas se impondrán por cualquier Estado contratante con relación solamente al derecho a transitar sobre, entrar a, o salir de su territorio sobre la aeronave de un Estado contratante o a las personas o propiedad ahí contenidas". (Traducción nuestra.) Íd., pág. 948.

 Ni del prólogo ni del texto del convenio multilateral suscrito en Chicago surge una obligación de las Naciones suscribientes a eximir de la imposición contributiva estatal sobre la propiedad mueble. El único artículo que hace referencia a una exención estatal, el Art. 24(a), lo hace en torno a partidas que no están relacionadas al tipo de contribución envuelta en este caso. La contribución sobre la propiedad en controversia no cualifica como una carga o tarifa nacional o local similar a los impuestos de aduana o tarifas de inspección mencionadas en dicho

artículo. Aunque se entendiera que la contribución sobre la propiedad mueble está incluida en dicho articulado, según su propio texto, se limitaría dicha exención a los bienes retenidos a bordo de la aeronave.

Por otro lado, la prohibición de imponer contribuciones sobre la propiedad, estatuida en la Sec. 15, se limita a la contribución impuesta por el mero derecho a transitar, entrar o salir del terreno de determinada Nación. Iberia no ha alegado, ni los hechos lo demuestran, que la contribución en controversia se base sobre este concepto.

■ Ahora pasemos a considerar el rol que ha desempeñado el I.C.A.O. sobre la imposición y exención de contribuciones sobre el tráfico aéreo internacional. El I.C.A.O. fue creado mediante la convención multilateral de Chicago en 1944. El I.C.A.O. fue establecido como un brazo de las Naciones Unidas para supervisar y regular el desarrollo de la aviación internacional. Su jurisdicción incluye el fomentar el crecimiento seguro y ordenado de la aviación civil internacional y la "responsabilidad de promover el desarrollo, diseño y operación de aeronaves, aeropuertos y facilidades de navegación apropiadas". (Traducción nuestra.) P.S. Dempsey, *Law & Foreign Policy In International Aviation*, Nueva York, Ed. Transnational Pub., 1987, pág. 273. Aunque tradicionalmente el I.C.A.O. se limitó a las materias técnicas de navegación, al surgir la tendencia de desregular la aviación civil internacional, la cual fue iniciada por Estados Unidos, se adentró en la reglamentación de los aspectos económicos. Íd., pág. 276. Así, en 1966 el I.C.A.O. aprobó tres (3) resoluciones y una recomendación en las que instaba a los Gobiernos de las Naciones suscribientes de la convención de Chicago a eximirse recíprocamente de ciertas contribuciones sobre la propiedad e ingreso. Íd., págs. 272 y 291.

Sin embargo, las resoluciones aprobadas tampoco se refieren a la imposición contributiva sobre la propiedad mueble en controversia. Una (1) de las resoluciones trata sobre

la exención contributiva de la gasolina y aceites lubricantes que se encuentran a bordo de una aeronave, y de los materiales técnicos fungibles (*i.e.*, fluidos hidráulicos, de enfriamiento, etc.). Otra de las resoluciones urge a la exención de la contribución sobre el ingreso obtenido y sobre las aeronaves operadas en el transporte aéreo internacional. La última de las resoluciones emitidas por el I.C.A.O. con relación a este tema versa sobre la eliminación de las contribuciones de venta o uso, inclusive sobre la ganancia bruta de los operadores de aeronaves y sobre los pasajeros. Esta última resolución incluye, además, las imposiciones contributivas sobre los boletos, hojas de ruta (*air cargo way bill*) y sobre la embarcación y desembarcación. Íd., págs. 291–292.

 A lo sumo, estas resoluciones evidencian la existencia de una meta internacional de lograr la mayor exención contributiva posible en el ámbito del tráfico aéreo. Sin embargo, no podemos decir que estas resoluciones incluyen el tipo de imposición contributiva sobre la propiedad mueble de una aerolínea internacional localizada en sus oficinas de venta. Además, aunque existiera una resolución emitida por el I.C.A.O. que expresamente prohibiera el tipo de contribución en controversia, esta resolución no representa una política pública de Estados Unidos, sino de una entidad internacional a la que Estados Unidos pertenece. Así lo explicó el Tribunal Supremo de Estados Unidos en *Wardair Canada v. Florida Dept. of Revenue*, supra:

> Mientras la resolución [del I.C.A.O.] innegablemente endosa un esquema internacional mediante el cual [la contribución estatal en controversia estaría exenta] ... la Resolución es formalmente y meramente el resultado de una organización internacional de la cual los Estados Unidos es miembro; no ha sido específicamente endosada, suscrita, acordada, aprobada, o emitida ni por la rama ejecutiva ni por la rama legislativa del Gobierno Federal. (Traducción nuestra.) *Wardair Canada v. Florida Dept. of Revenue*, supra, pág. 11.

Finalmente, ninguno de los acuerdos ejecutivos bilaterales entre Estados Unidos y otras Naciones prohíbe taxativamente la imposición de contribuciones estatales sobre la propiedad. De hecho, un gran número de acuerdos ejecutivos contienen exenciones a nivel nacional solamente, como es el caso del Acuerdo entre Estados Unidos y España. Muchos acuerdos bilaterales contienen prácticamente el mismo lenguaje del Art. 8 del Acuerdo en cuestión, *supra*, a saber:

> Sobre la base de reciprocidad, cada Parte Contratante exonerará, en la máxima medida posible que sus leyes nacionales le permitan ... de las restricciones de importación, impuestos de aduanas, impuestos de consumo, derechos de inspección y otros impuestos o gravámenes nacionales y tasas por concepto de combustible, lubricantes ....(18)

Similarmente, el Acuerdo de Servicios de Transporte Aéreo entre el Gobierno de los Estados Unidos y el Gobierno de Costa Rica de 20 de octubre de 1983, Art. 9(1), T.I.A.S. 10894, se refiere a las cargas impuestas por las "autoridades nacionales". Otros acuerdos se refieren a las "contribuciones federales" y a "los impuestos o gravámenes nacionales de la parte contratante". Véase, respectivamente, el Acuerdo de Servicios de Transporte Aéreo entre el Gobierno de Estados Unidos y el Gobierno de Brasil de 23 de junio de 1982, Art. 9, T.I.A.S. 10896, y el Acuerdo de Servicios de Transporte Aéreo entre el Gobierno de Estados Unidos y el Gobierno de Ecuador de 8 de enero 1947, Art. 3(b), T.I.A.S. 1606.

---

(18) Acuerdo de Servicios de Transporte entre el Gobierno de Estados Unidos y el Gobierno de Jamaica de 2 de octubre de 1969, Art. 8(a) (20 U.S.T. 2962, 2966) (lenguaje idéntico); Acuerdo de Servicio Aéreo entre el Gobierno de Estados Unidos y el Gobierno de Canadá de 8 de mayo de 1974, Art. 12(1) (25 U.S.T. 794) (lenguaje idéntico); Acuerdo de Servicios de Transporte Aéreo entre el Gobierno de Estados Unidos y el Gobierno de los Estados Unidos Mexicanos de 15 de agosto de 1960, Art. 7 (12 U.S.T. 61, 65) (provee para exenciones de "impuestos de aduana, derechos de inspección, y otros impuestos o gravámenes nacionales"); Acuerdo de Servicios de Transporte Aéreo entre el Gobierno de Estados Unidos y el Gobierno de la República de Colombia de 24 de octubre de 1956, Art. 7 (14 U.S.T. 429, 432) (provee para exenciones de "derechos de aduana, tarifas de inspección y de cualquier gravamen o impuesto nacional").

Es importante notar que todos los acuerdos menciona-
dos anteriormente, además de omitir mención alguna a las
contribuciones impuestas por las subdivisiones políticas de
las partes contratantes, omiten referencia alguna a las
contribuciones sobre la propiedad. Además, al igual que el
Acuerdo en cuestión, cualquier frase general contenida en
dichos acuerdos, típicamente fraseada como "u otras con-
tribuciones o gravámenes nacionales", no se puede inter-
pretar como que corresponde al tipo de contribución sobre
la propiedad mueble afectada en este caso. Todos estos tra-
tados se refieren al combustible, aceites, lubricantes, ma-
teriales técnicos fungibles, piezas de repuesto, equipo co-
rriente o terrestre y provisiones para uso o servicio de la
aeronave, que se retengan a bordo, o que se pongan a bordo
de la aeronave.

Es interesante notar que algunos de los acuerdos bila-
terales suscritos en años más recientes expresamente se
dirigen a las contribuciones impuestas por subdivisiones
políticas tales como los estados, las provincias, etc. Sin em-
bargo, todos estos acuerdos utilizan el lenguaje típico de
una cláusula de mejor esfuerzo (*best efforts*). A esos efectos,
típicamente disponen que las partes contratantes "utiliza-
rán sus mejores esfuerzos para asegurar a las líneas aé-
reas designadas por la otra Parte, sobre la base de recipro-
cidad, una exención de contribuciones, impuestos,
gravámenes y tarifas impuestas por autoridades estatales,
regionales y locales ...".([19])

Los acuerdos que específicamente se refieren a una

---

([19]) Véanse: Acuerdo de Servicios de Transporte Aéreo entre el Gobierno de
Estados Unidos y el Gobierno de Barbados de 8 de abril de 1982, Art. 9(5), T.I.A.S.
10370 (84-1041 J.S. App. 110); Acuerdo de Servicios de Transporte Aéreo entre el
Gobierno de Estados Unidos y el Gobierno de Costa Rica de 20 de octubre de 1983,
Art. 9(5) (84-922 J.S. App. 88a); Acuerdo de Servicios de Transporte Aéreo entre el
Gobierno de Estados Unidos y el Gobierno de El Salvador de 2 de abril de 1982, Art.
9(5), T.I.A.S. 10488 (84-1041 J.S. App. 115); Acuerdo de Servicios de Transporte Aé-
reo entre el Gobierno de Estados Unidos y el Gobierno de Jamaica de 4 de abril de
1979, Art. 10(6), T.I.A.S. 9613 (84-1041 J.S. App. 104).

exención estatal, limitan dicha exención a determinados artículos. Así, los acuerdos con Barbados y El Salvador, de lenguaje prácticamente idéntico, limitan dicha exención a "su equipo regular, equipo terrestre, combustible, lubricantes, suministros técnicos fungibles, repuestos, incluyendo motores, suministros para las aeronaves (incluyendo pero no limitándose a renglones tales como comida, bebidas y licor, tabaco, y otros product[o]s destinados a la venta a los pasajeros o al uso de los pasajeros, en cantidades limitadas, durante el vuelo), y otros rubros que se utilizarán únicamente en conexión con la operación o el servicio de aeronaves ... o utilizados exclusivamente con relación a dichas operaciones de explotación o servicio". Véanse: Art. 9(1), 34 U.S.T. 2335; Art. 9(5), 34 U.S.T. 2337; Art. 9(1), 34 U.S.T. 447; Art. 9(5), 34 U.S.T. 448. Por otro lado, el acuerdo de 1979 con Jamaica limita las exenciones estatales a los mismos rubros estatuidos en el Art. 8(a) del Acuerdo en cuestión, *supra*. Véanse: Art. 10(6), 31 U.S.T. 325; Art. 8(a), 20 U.S.T. 2966.

En resumidas cuentas, niguno de los acuerdos mencionados prohíbe el tipo de contribución estatal envuelta en el presente caso. Como hemos visto, las exenciones estatales provistas son inaplicables al caso de autos.

De las actuaciones del Gobierno de Estados Unidos a nivel internacional no se puede colegir que el Congreso haya tenido la intención de prohibir el tipo de actuación estatal en controversia. Al contrario, los actos del Congreso demuestran que éste permite la imposición contributiva estatal en cuestión. Igualmente, el esquema legislativo federal, según esbozado en el *Airport Development Acceleration Act* de 1973 y el *Federal Aviation Act* de 1958, demuestran que el Congreso autorizó a los estados a imponer contribuciones sobre la propiedad de las aerolíneas internacionales como Iberia. Ante este panorama, contrario a la posición de Iberia, la actuación del Estado Libre Asociado

no violenta el esquema federal delineado para lidear con la imposición contributiva estatal sobre el comercio aéreo internacional.

## V

*Conclusión*

Por todos los fundamentos que anteceden, *se dictará sentencia confirmando la dictada por el Tribunal Superior, Sala de San Juan, de 27 de febrero de 1986.*

Los Jueces Asociados Señores Negrón García y Fuster Berlingeri concurrieron sin opinión escrita. El Juez Asociado Señor Hernández Denton no intervino.