NORMAN GREIG, sustituído por su viuda RUTH WHEELER GREIG, y NOAH H. SWAYNE, como Albacea Testamentario de la Herencia de dicho Norman Greig, demandantes y apelantes, *v.* JOSÉ R. NOGUERA, SECRETARIO DE HACIENDA DEL ESTADO LIBRE ASOCIADO DE PUERTO RICO, demandado y apelado.

*Números:* 12725, 12726    *Resueltos:* 1 de noviembre de 1962

346

*Hartzell, Fernández & Novas,* abogados de los apelantes; *J. B. Fernández Badillo, Procurador General* y *Genoveva R. de Carrera, Procurador General Auxiliar,* abogados del apelado.

Sala integrada por el Juez Asociado Señor Pérez Pimentel como Presidente de Sala y los Jueces Asociados Señores Rigau y Dávila.

El Juez Asociado Señor Rigau emitió la opinión del Tribunal.

Se trata de dos acciones basadas en los mismos hechos y en las cuales los puntos en controversia también son los mismos. Por lo tanto las consideraremos y resolveremos ambas en esta opinión.

El recurrente era un súbdito de la Gran Bretaña, oriundo de Escocia y residente en el estado de Carolina del Norte en los Estados Unidos, quien tuvo ingresos durante los años 1949 al 1953, inclusive, de fuentes radicadas en Puerto Rico. Declaró dicho ingreso y pagó la contribución sobre ingresos

a base de la tasa del 7 por ciento. El Secretario de Hacienda del Estado Libre Asociado de Puerto Rico (antes Tesorero de Puerto Rico) le notificó deficiencias por entender que tratándose de un ciudadano extranjero no residente en Puerto Rico, debió pagar la contribución al tipo de 29 por ciento que imponía la Ley de Contribuciones Sobre Ingresos de 1924, 13 L.P.R.A. sec. 691.(¹) Luego de los trámites correspondientes de reconsideración y notificación definitiva, el recurrente pagó la contribución según ésta fue computada por el Secretario de Hacienda y presentó dos reclamaciones de reintegro fundadas, una, en la diferencia del importe de la contribución según fue pagada y el importe de la misma si se hubiese tasado a base del 7 por ciento, y, la otra, en la exención personal de $2,000.00 concedida por la ley a personas casadas que viven con su cónyuge, exención que el recurrente por inadvertencia dejó de reclamar en su declaración. Ambas solicitudes de reintegro fueron denegadas y el recurrente acudió al Tribunal Superior, el cual sostuvo al Secretario de Hacienda. La controversia se contrae a los años 1950–53 pues el recurrente aceptó la defensa de prescripción levantada por el demandado respecto al año 1949 en el caso número 12726. ■

El demandante se apoya en el Art. XXI del convenio o tratado existente entre el Reino Unido de Gran Bretaña y los Estados Unidos relativo a las contribuciones sobre ingresos.(²) En virtud de ese tratado, argumenta, él debe tributar en Puerto Rico con respecto a ingresos provenientes de este país en la misma forma que tributaría un ciudadano de los Estados Unidos no residente, esto es, igual que un

---

(¹) La disposición equivalente a la citada, de la vigente Ley de Contribuciones Sobre Ingresos de 1954 se encuentra en 13 L.P.R.A. sec. 3211. En el caso de individuos extranjeros no residentes el ingreso bruto incluye solamente el ingreso bruto de fuentes dentro de Puerto Rico. 13 L.P.R.A. sec. 3212.

(²) *Convention between the United States of America and the United Kingdom respecting double taxation and taxes on income*, 60 Stat. 1377 (1946); *U. S. Treaties and Other International Agreements*, Vol. 6, Part I, p. 37 (1955); 9 UST 1329 y 1459.

ciudadano residente. Ley de Relaciones Federales, sec. 2, Tomo I de L.P.R.A. (1954) pág. 165; *Postley* v. *Secretario de Hacienda,* 75 D.P.R. 874.

Por su parte, el Secretario se basa en el Art. II del mismo documento. Sostiene que ese artículo excluyó a Puerto Rico del ámbito del convenio. A los fines de interpretarlas y aplicarlas veamos las disposiciones del convenio que aquí entran en juego.

El Art. I expresa, en lo pertinente, que el mismo cubre las leyes de contribución sobre ingresos de los Estados Unidos y del Reino Unido de Gran Bretaña "y cualesquiera otras contribuciones de naturaleza similar impuestas por las partes contratantes con posterioridad a la firma de esta Convención o por el gobierno de cualquier territorio al cual se le extienda la misma a tenor con su Art. XXII." [3]

El Art. II expresa que el término "Estados Unidos" significa "los Estados Unidos de América, y cuando se usa en sentido geográfico significa los Estados, los territorios de Alaska y Hawaii, y el Distrito de Columbia." [4]

El Art. XXI dispone que los nacionales de una de las partes contratantes, cuando residan en el territorio de la otra parte contratante, no estarán sujetos a contribuciones más onerosas que las que deban pagar los nacionales de dicha segunda parte contratante cuando estén en su propio territorio. Al definir el término "nacionales" según se utiliza en dicho Art. XXI, el mismo artículo expresa que en cuanto a Estados Unidos se refiere dicho término significa

[3] La parte citada de ese Artículo I lee así en su texto oficial: "The present Convention shall also apply to any other taxes of a substantially similar character imposed by either Contracting Party subsequently to the date of signature of the present Convention or by the government of any territory to which the present Convention is extended under Article XXII." 60 Stat. 1378.

[4] La parte pertinente del citado Art. II lee como sigue: "In the present Convention, unless the context otherwise requires: (a) The term 'United States' means the United States of America, and when used in a geographical sense means the States, the Territories of Alaska and of Hawaii, and the District of Columbia." 60 Stat. 1378.

"ciudadanos de los Estados Unidos, y todas las personas que estén bajo la protección de los Estados Unidos, vengan éstas de los Estados Unidos o de cualquier territorio al cual esta Convención se aplique mediante extensión de la misma hecha por los Estados Unidos a tenor con el Art. XXII." El mismo artículo define la palabra "contribuciones" y expresa que en el contexto de ese artículo la palabra **contribuciones** significa "contribuciones de toda clase y descripción, sean estas nacionales, federales, estatales, provinciales o municipales." El texto oficial de dicho Art. XXI se transcribe *verbatim* en el margen.(5)

El Art. XXII al cual hacen referencia los artículos citados contiene el procedimiento para hacer extensivo el convenio a territorios bajo el dominio de los países contratantes, si así lo deseasen las partes. No creemos necesario transcribirlo ya que el mismo no está aquí en controversia.

Si adoptásemos una interpretación restrictiva del convenio en cuestión, tendríamos que coincidir con el Secretario

---

(5)"Article XXI

(1) The nationals of one of the Contracting Parties shall not, while resident in the territory of the other Contracting Party, be subjected therein to other or more burdensome taxes than are the nationals of such other Contracting Party resident in its territory.

(2) The term 'nationals' as used in this Article means

    (a) in relation to the United Kingdom, all British subjects and British protected persons, from the United Kingdom or any territory with respect to which the present Convention is applicable by reason of extension made by the United Kingdom under Article XXII; and

    (b) in relation to the United States, United States citizens, and all persons under the protection of the United States, from the United States or any territory to which the present Convention is applicable by reason of extension made by the United States under Article XXII; and includes all legal persons, partnerships and associations deriving their status as such from, or created or organized under, the laws in force in any territory of the Contracting Parties to which the present Convention applies.

(3) In this Article the word "taxes" means taxes of every kind or description, whether national, Federal, state, provincial or municipal." 60 Stat. 1386.

de Hacienda ya que el Art. II al definir el término "Estados Unidos", como vimos anteriormente, menciona a los estados federados, a los (entonces) territorios de Alaska y Hawaii y al Distrito de Columbia y no menciona a Puerto Rico. (6) Por el contrario, los demandantes nos solicitan que adoptemos una interpretación extensiva que proteja los derechos conferidos por el convenio a los nacionales de las partes contratantes, esto es, a los *ciudadanos de los Estados Unidos* y a los *súbditos británicos* (Art. XXI del tratado).

¿Cuál es, pues, la forma en que este Tribunal debe interpretar el convenio que nos ocupa? En primer lugar, conviene que aclaremos que los países contratantes acostumbran denominar a los acuerdos internacionales con diversos nombres, tales como tratados, convenciones (*conventions*), actas (*acts*), protocolos (*protocols*), acuerdos (*agreements*), pactos (*compacts*), "*modi vivendi*", estatutos (*statutes*), y cartas (*charters*). Sin embargo, no importa el nombre que utilicen, es regla universal que una vez que sean debidamente aprobados dichos acuerdos obligan a las partes contratantes. Hackworth, *Digest of International Law*, (1943), Vol. V, pp. 1–4; Jessup, *A Modern Law of Nations*, (1952), pp. 123–124; "*Harvard Research in International Law, Draft Convention on the Law of Treaties*," 29 Am. J. Int. L. Supp. (1935), pp. 653, 667 y 710; Mc Nair, *Law of Treaties*, p. 3 (1938); Briggs, *The Law of Nations*, 2a. ed. (1952), p. 837; Brierly, *The Law of Nations*, 3ra. ed. (1942), p. 195; Bishop, *International Law*, 2a. ed. (1962), p. 86. **[3-4]**

---

(6) Recuérdese que el convenio fue firmado en Washington en 16 de abril de 1945. 60 Stat. 1377. Como se sabe, con posterioridad a esa fecha Alaska y Hawaii se convirtieron en estados federados de la Unión Americana y Puerto Rico se convirtió en un estado libre asociado a dicha Unión. En cuanto a Puerto Rico, véase, Ley Pública 600, 64 Stat. 314 (1950); Constitución del Estado Libre Asociado de Puerto Rico, Leyes de Puerto Rico Anotadas, Tomo I (1954), pp. 181–221; Ley Pública 447, 66 Stat. 327 (1952); Resolución 34 de la Convención Constituyente de Puerto Rico, de 10 de julio de 1952, L.P.R.A., Tomo I, p. 141; Proclama del Gobernador de Puerto Rico de 25 de julio de 1952, L.P.R.A., Tomo I, p. 143.

En segundo lugar, la regla general, que es además la norma seguida por el Tribunal Supremo de los Estados Unidos, sobre la interpretación de tratados y demás acuerdos internacionales es al efecto de que éstos deben interpretarse liberalmente, de manera que se cumplan sus propósitos y se le dé efectividad a sus disposiciones. A esos fines deben evitarse las interpretaciones restrictivas y técnicas. El Tribunal Supremo federal ha establecido claramente, expresándose sobre el particular en forma parecida repetidas veces, que "cuando las disposiciones de un tratado son susceptibles de dos interpretaciones razonables, una que restringe los derechos que pueden invocarse bajo el mismo, y otra que los amplía, debe preferirse la interpretación más liberal." *Factor* v. *Laubenheimer*, 290 U.S. 276, 293; 78 L. ed. 315, 324 (1933). Añadió el Juez Stone en la opinión del Tribunal del citado caso, a la página 324, que las consideraciones de buena fe que deben gobernar las relaciones internacionales, requieren que las obligaciones de los Estados se interpreten liberalmente de manera que se realice la intención de las partes y se logre la igualdad y la reciprocidad entre ellas. Al mismo efecto véase *Nielsen* v. *Johnson*, 279 U.S. 47, 51–52; 73 L. ed. 607, 610 (1928); *Jordan* v. *Tashiro*, 278 U.S. 123, 127; 73 L. ed. 214, 218 (1928); y *Asakura* v. *Seattle*, 265 U.S. 332; 68 L. ed. 1041 (1924).

La expresada regla no es reciente. Ya en el año 1830 el Juez Story se había expresado en términos muy parecidos en *Shanks* v. *Dupont*, 3 Pet. 242, 249. En el 1879 el Juez Swayne expresaba que la norma de la interpretación liberal de los tratados era "la regla establecida" en el Tribunal Supremo de los Estados Unidos, *Hauenstein* v. *Lynham*, 100 U.S. 483, 487. Reiterando la norma, el mismo Tribunal en *Geofroy* v. *Riggs*, 133 U.S. 258 resuelto en el año 1890, decidió que a los fines de una convención pactada con Francia en 1853, un terreno sito en el Distrito de Columbia estaba en uno "de los estados de la Unión." Utilizando el mismo criterio de interpretación extensiva se resuelve en 1902 el

caso de *Tucker* v. *Alexandroff*, 183 U.S. 424, 437; 46 L. ed. 264, 270, y se mantiene dicha regla en *Asakura* v. *Seattle*, supra, y casos posteriores anteriormente aquí citados. Véase también *Bacardí Corporation of America* v. *Domenech*, 311 U.S. 150; 85 L. ed. 98 (1940). En *American Trust Co.* v. *Smyth*, 247 F.2d 149 (1957) se interpreta el Art. XIV del convenio de autos, relativo a ganancias de capital (*capital gains*), y se resuelve de acuerdo con la regla extensiva mencionada. Expresa el tribunal a la página 153, que debe interpretarse el tratado en su conjunto y a la luz de sus objetivos de lograr la reciprocidad entre ambos países contratantes y la igualdad contributiva entre sus ciudadanos. Recientemente el Tribunal Supremo de los Estados Unidos, al revocar una interpretación restrictiva del Tribunal Supremo de Oregón dada a un convenio con Yugoeslavia, recordó que ese Tribunal ha rechazado muchas veces interpretaciones que restringen derechos que los tratados se proponen proteger, *Kolovrat* v. *Oregon*, 366 U.S. 187, 193 (1961). Además de las decisiones judiciales citadas sobre el particular, véase, Hackworth, *Ibid*, pp. 222-234; Lauterpacht, *The Development of International Law by the International Court*, Stevens & Sons Ltd., Londres (1958) pp. 282-284 y 305-306; Hyde, *International Law, Chiefly as Interpreted and applied by the United States*, 2a. ed. (1951), Vol. II, pp. 1478-1481; 29 Am. J. Int. L., Supp. (1935), pp. 937-977; Ulloa, *Derecho Internacional Público*, 4ta. ed. (1957), Vol. II, pp. 236-241; Accioly, *Tratado de Derecho Internacional Público* (1958), Vol. I, pp. 655 y 663; Graske, en 10 Tulane L. R. 257 (1936); Lenoir, en U. Chi. L. Rev. 602 (1934). ▪

Reconocemos que en el caso de autos podría concebiblemente fallarse de acuerdo con la posición asumida por el Secretario de Hacienda, en virtud del Art. II del convenio, como ya hemos señalado antes, pero también puede fallarse razonablemente a favor de los demandantes en virtud del citado Artículo XXI, muy especialmente a la luz del derecho

sobre la materia que hemos explicado. Dicho artículo dispone en su apartado (2) (b) que cubre a los *ciudadanos de los Estados Unidos*. Como las personas nacidas en Puerto Rico son ciudadanos de los Estados Unidos[7] ese apartado confiere derecho a los puertorriqueños a invocar los beneficios del tratado en la Gran Bretaña. Justo es que los súbditos británicos puedan hacer valer su derecho correspondiente, bajo el mismo convenio, en Puerto Rico. También dicho Artículo XXI en su apartado (3) expresa que se refiere a contribuciones·*"de toda clase y descripción*, sean estas nacionales, federales, estatales, provinciales o municipales." (Subrayado nuestro.) Véase el escolio 5. Al interpretar las citadas disposiciones debe tenerse presente, además de las consideraciones ya expuestas, que como en este campo no se favorecen las interpretaciones restrictivas, no opera la regla de *ejusdem generis* que en derecho municipal, con o sin razón, se invoca con frecuencia. *Factor* v. *Laubenheimer*, supra; Mc Nair, *Law of Treaties* (1938), 207; Hackworth, *Op. Cit.*, 233.

Adoptamos, pues, la interpretación que da mayor efectividad a las cláusulas del convenio y que hace posible la realización de su propósito—no imponer contribuciones más onerosas a los súbditos británicos que las que pagan los nacionales—y por consiguiente fallamos a favor de los demandantes. Estamos persuadidos de que ésta es la mejor norma, y especialmente en una época en que por razones que debieran ser evidentes el mundo marcha hacia mayores y más estrechas relaciones económicas. Como ejemplo de esto recuérdese al creciente *Mercado Común Europeo*, a la *Comunidad Europea del Carbón y del Acero*, la *Organización Europea de Cooperación Económica*, la *Organización Económica de Cooperación y Desarrollo*, el *Acuerdo General de Aranceles*

---

[7] Ley de Relaciones Federales, sec. 5b, L.P.R.A., Tomo I p. 169; 48 Stat. 1245.

*Aduaneros y Comercio*, la *Asociación de Desarrollo Internacional*, el *Fondo Especial de las N. U. para Desarrollo Económico*, la *Corporación de Fomento Internacional*, el *Banco Internacional de Reconstrucción y Fomento*, el *Fondo Monetario Internacional*, el *Acuerdo Internacional del Café*, el *Banco de Desarrollo Interamericano*, la *Asociación Latino Americana de Libre Comercio*, la *Federación Cafetalera de América* y la *Comisión Económica Para América Latina*.

Además creemos que el terror que la guerra nuclear significa ha creado las tinieblas de donde surgirá una verdadera aurora del derecho internacional. Las naciones y la humanidad no podrán continuar en la presente situación semi-anárquica en que con frecuencia las naciones se ven obligadas a tomarse la justicia por su mano. Un derecho internacional elaborado con generosidad ayudará en algo a llegar a esa meta.

*Se revocarán las sentencias dictadas por el Tribunal Superior, Sala de San Juan, en estos dos casos, en 29 de junio de 1959, y se declararán con lugar las demandas en ambos casos, sin especial condena de costas, gastos y honorarios de abogado.*[*]

---

*NOTA EDITORIAL:

La Resolución de 26 de abril de 1963 aprobada por la Sala, dispone en parte:

"Por los motivos expresados en la opinión de este Tribunal dictada en 1ro. de noviembre de 1962 se revocan las sentencias dictadas por el Tribunal Superior, Sala de San Juan, en estos casos, en 29 de junio de 1959, se declaran con lugar las demandas en ambos casos, y se ordena el reintegro solicitado, *menos el reintegro correspondiente al año 1949 en el caso 12,726*, con intereses desde la fecha en que se solicitó dicho reintegro, sin especial condena de costas, gastos y honorarios de abogado."