**SMIT AMERICAS, INC. for itself and on behalf of Edward J. Hosking, its employee, Plaintiff,**

v.

**The M/T "Mantinia" et al., Defendants.**

**No. CIV. 95–2498(RLA).**

United States District Court, D. Puerto Rico.

Jan. 15, 1999.

Francisco G. Bruno–Rovira, McConnell Valdes, San Juan, PR, James T. Shirley, Jr., Haight Gardner Holland & Knight, New York, NY, for Plaintiff.

Juan Ramón Rivera Morales, Jimenez Graffam & Lausell, San Juan, PR, Paul E. Calvesbert–Borgos, José G. Baquero–Tirado, San Juan, PR, Steven P. Kyne, Burke & Parsons, New York, NY, for Defendants.

### *ORDER DENYING MOTION TO DISMISS THE COMPLAINT AS UNTIMELY FILED*

ACOSTA, District Judge.

Defendants[1] have moved the Court to dismiss the salvage award claim filed in this action as being time-barred. The Court having reviewed the memoranda filed by the parties hereby finds that the complaint was timely filed.

## I. THE FACTS

For purposes of our ruling the controversy surrounding the facts is largely irrelevant and uncontroverted. Therefore, an abbreviated recitation will suffice.

On June 1, 1994 the M/T MANTINIA ran aground off the south coast of Puerto Rico, approximately one half mile south-west of the entrance to Guayanilla Bay.

The salvage services alleged in the complaint were provided on June 3, 1994 and the suit instituted on December 7, 1995, that is 18 months after the event giving rise to the litigation.

At all relevant times the M/T MANTINIA was registered under the laws of Greece and owned by METRO FREIGHTING CORP. with principal offices also in Greece. WEST OF ENGLAND is a Luxembourg company with its principal office and place of business in the UNITED KINGDOM. LONDON UNDERWRITERS include several insurers who are all located in the UNITED KINGDOM. U.S. UNDERWRITERS include several insurers who are all located in the UNITED STATES.

Plaintiff SMIT AMERICAS, INC.[2] is an American company incorporated in Delaware.

GREECE, the UNITED KINGDOM and the UNITED STATES are signatories to the Salvage Convention of 1910[3] (hereinafter the 1910 Treaty). The United States ratified the document in 1913.[4]

## II. THE ISSUE

█ The controversy in this action centers on the applicable statute of limitations to the facts as presented. Defendants contend that we are bound to utilize the one year interval provided for salvage claims contained in art. 948 of the Puerto Rico Commerce Code, Laws of P.R. Ann. tit. 10, § 1910(3) (1997). Defendants argue, essentially, that under the U.S. Constitution, treaties and statutes are equal in dignity since the supremacy clause does not distinguish between treaties and acts of Congress. They further argue that any conflicts between the two are resolved by the doctrine of implied repeal with the later in time prevailing. Consequently, since Public Law 600 was enacted subsequent to the 1910 Treaty, it prevails thereby overriding any inconsistent provision between the two which, in this case, is the time limit for the institution of a claim. Defendants conclude that since the Commerce Code of Puerto Rico provides for a one-year limitation the action must be dismissed because it was instituted some 18 months after the event.

Defendants anchor their premise of the priority of the Commerce Code of Puerto Rico over the 1910 Treaty on a provision of

1. Two dispositive motions were filed on this issue. The first one was submitted on behalf of several insurers each of whom subscribed a proportionate several share of Marine Hull and Machinery Slip Policy No. UU9300205 commonly identified as the "LONDON UNDERWRITERS" and U.S. UNDERWRITERS OF INSURANCE collectively referred to hereinafter as "UNDERWRITERS". The other dismissal petition was jointly filed by METRO FREIGHTING CORP. and WEST OF ENGLAND SHIPOWNERS PROTECTION AND INDEMNITY ASSOCIATION (LUXEMBOURG) LTD ("WEST OF ENGLAND").

2. SMIT is a wholly-owned subsidiary of SMIT–TAK B.V., a NETHERLANDS company.

3. Reproduced in 3A Benedict on Admiralty (7th ed.) App. B.

4. For an historical background of the Convention see Alex L. Parks, Admiralty Law Institute: Symposium on American and International Maritime Law: Comparative Aspects of Current Importance—The 1910 Brussels Convention, The United States Salvage Act of 1912, and Arbitration of Salvage Cases in the United States, 57 Tul.R.Rev. 1457 (1983). Its provisions were updated through the 1989 International Convention on Salvage ratified by the United States in 1992. See William L. Neilson, The 1989 International Convention on Salvage, 24 Conn. L.Rev. 1203 (1992) and Nicholas J.J. Gaskell, The 1989 Salvage Convention and the Lloyd's Open Form (LOF) Salvage Agreement 1990, 16 Tul. Mar. L.J. 1 (1991).

the Federal Relations Act (FRA) which they maintain can supplant general U.S. maritime law and, to some extent, admiralty statutes even though inconsistent therewith.[5]

Plaintiffs, on the other hand, contend that Puerto Rico possesses no foreign relations power and so long as Puerto Rico retains a "commonwealth" status under the provisions of the FRA it may be free in the management of its own local affairs much like a state of the union. However, plaintiff maintains, it does not have an independent and separate existence in a sovereign nation sense, but is linked to the United States of America and hence is a part of its political system compatible with its federal structure.[6] Citing the Charming Betsy,[7] plaintiffs assert that though Puerto Rico may legislate on local matters which, in some instances, may be inconsistent with federal law,[8] it cannot, however, even when Congress makes no express

exclusion of Puerto Rico from treaty powers, enact legislation in contravention of such treaty between the United States and other sovereign nations.

The political status of Puerto Rico is implicated in resolving the matter at hand [9] inasmuch as defendants' theory endows the Island with the prerogative of abrogating obligations entered into by the United States in the international arena. Thus, in order to determine the applicable limitations period in this action we must, perforce, examine the historical development of the Commonwealth [10] of Puerto Rico [11] which has oft been told in this Circuit.

## III.  *PUERTO RICO*

### A.  THE FIRST 50 YEARS [12]

In 1898 as a result of the Spanish American War, Puerto Rico was ceded from Spain

**5.** Apart from asserting that the 1910 Treaty was implicitly superseded by subsequent congressional action, defendants do not contest the applicability of its provisions to Puerto Rico. Although not pertaining to Puerto Rican territorial waters, when confronted with the issue, the local Supreme Court has held that treaties in which the United States is a signatory nation are applicable to Puerto Rico. *See Tello v. Eastern Airlines, Inc.,* 119 D.P.R. 83, 1987 WL 448303(1987) and *Delgado v. Pan Am. World Airways, Inc.,* 112 D.P.R. 329, 1982 WL 210645 (1982) (1929 Warsaw Treaty applicable to Puerto Rico since it was not specifically excluded as allowed for by the Treaty). *See also Greig v. Noguera,* 86 D.P.R. 345, 1962 WL 14731 (1962) (Puerto Rico bound by income tax treaty in effect between the United States and Great Britain).

**6.** *See Feliciano v. United States,* 297 F.Supp. 1356 (D.P.R.1969), *affirmed* 422 F.2d 943 (1st Cir.1970); *cert. denied* 400 U.S. 823, 91 S.Ct. 44, 27 L.Ed.2d 51 (1970).

**7.** *Murray v. The Schooner Charming Betsy,* 6 U.S. (2 Cranch) 64, 118, 2 L.Ed. 208 (1804).

**8.** *Guerrido v. Alcoa S.S. Co.,* 234 F.2d 349 (1st Cir.1956)

**9.** The political status of Puerto Rico has been amply discussed by the courts and found relevant to resolve a myriad of issues. *See i.e., United States v. Sanchez,* 992 F.2d 1143 (11th Cir.1993) (effect of Federal Relations Act on the applicability of double jeopardy); *Trailer Marine Transp., Corp. v. Rivera Vazquez,* 977 F.2d 1, 7 (1st Cir. 1992) (local premium assessment on van trailer vehicles engaged in maritime transportation upheld as not in violation of Commerce Clause);

given current situation, "Puerto Rico is subject to the constraints of the dormant Commerce Clause doctrine in the same fashion as the states"; *United States v. Quinones,* 758 F.2d 40 (1st Cir.1985) (discussion of relationship between United States and Puerto Rico in resolving the admissibility of wiretapping in federal court when proscribed by the local constitution); *Popular Democratic Party v. Commonwealth of Puerto Rico,* 24 F.Supp.2d 184 (D.P.R.1998) (federal jurisdiction available to review the validity of political status referendum since "only federal law, rather than local law, has defined the juridical status of the island"); *Nogueras–Cartagena v. Rosello–Gonzalez,* 182 F.R.D. 380 (D.P.R.1998) (federal court may entertain action attacking constitutionality of referendum defining political options since political status of Puerto Rico is defined by federal statutes establishing the Commonwealth).

**10.** The phrase "Estado Libre Asociado" which literally translated is "Associated Free State", has been termed "Commonwealth" in English.

**11.** Because our determination is grounded on the effects of the political relationship between the United States and Puerto Rico in its legislative powers, we find no need to construe the present case under the "Charming Betsy canon" discussed by the parties in their memoranda and explained in Curtis A. Bradley, The Charming Betsy Canon and Separation of Powers; Rethinking the Interpretive Role of International Law, 86 Geo.L.J. 479 (1998).

**12.** This period covers from 1900, the year when the Foraker Act was enacted, to 1950, the year Congress approved Pub.L. No. 600.

to the United States.[13]  After a year and a half of military rule, on April 12, 1900 President McKinley signed into law the Organic Act of 1900 known as the "Foraker Act", c. 191, 31 Stat. 77, *reprinted in* P.R. Laws Ann. tit. 1, at 26 (1982).  The Foraker Act provided, among other things, for the appointment by the President of the United States, of a governor, an executive council—which together with the House of Delegates comprised the Legislative Assembly—as well as a resident commissioner.  A federal court was established but local judicial power was vested in a Supreme Court whose members were to be appointed by the President.  The Governor would appoint the lower court judges.  Decisions of the Supreme Court of Puerto Rico could be appealed to the U.S. Supreme Court.  Citizenship was not extended to the inhabitants of the Island.  There was a customs arrangement between the United States and Puerto Rico although the Island had no right to impose its own tariffs or enter into commercial treaties.  Harbor areas and navigable waters were specifically excluded from the local government's domain pursuant to § 13.  Further, according to § 8, United States laws were extended to Puerto Rico, unless found to be locally inapplicable.

On March 2, 1917, by virtue of the Organic Act of 1917, c. 145, 39 Stat. 951, popularly known as the "Jones Act",[14] U.S. citizenship was bestowed upon the people of Puerto Rico, by the process of collective naturalization.[15]  In addition, some minor changes toward self-government were made by way of amendment to the Foraker Act, such as an elective senate and senate confirmation power in the appointment of some government secretaries.  Under § 8 harbor areas and navigable waters were "placed under the con-

trol of the government of Puerto Rico".  This section further disposed that "all laws of the United States for the protection and improvement of the navigable waters of the United States and the preservation of the interests of navigation and commerce, **except** so far as the same may be **locally inapplicable,** shall apply to said Island and waters" (emphasis ours).

On August 5, 1947, Congress granted Puerto Rico the right to elect its own governor.[16]  The President of the United States retained the power, however, to appoint the justices of the local Supreme Court [17] and the auditor.[18]

During the legislative proceedings prior to the enactment of the statute authorizing the governor's election the Department of Interior pointedly remarked in its report:

> The changes which would be made by the enactment of H.R. 3309 would not alter Puerto Rico's political or fiscal relationship to the United States.  Congress does not surrender any of its constitutional authority to legislate for Puerto Rico or to review insular laws.

H.R.Rep. No. 455, 80th Cong. 1st Sess, *reprinted in* 1947 U.S. Cong. Serv. 1588.

As can be seen, the first 50 years of Puerto Rico's relationship with the United States consisted of piece-meal enlargement of self-government by Congress to the Island.[19]

## B.  THE ESTABLISHMENT OF THE COMMONWEALTH

On July 25, 1952, the Commonwealth of Puerto Rico was established under its own constitution as a result of Pub.L. No. 600.  The preamble to Pub.L. No. 600 acknowl-

---

**13.**  *See* Treaty of Paris, 1898 art.  VIII, *reprinted in* P.R. Laws Ann. tit. 1, at 17 (1982).

**14.**  *Reprinted in* P.R. Laws Ann. Tit. 1, at 26 (1982).

**15.**  As against individual naturalization where each resident would individually elect to become a citizen.  In some quarters collective naturalization has been looked upon as an imposed citizenship.

**16.**  ˙Elective Governor Act, Pub.L. No. 80–362, 61 Stat. 770 (1947).

**17.**  Jones Act § 40.

**18.**  Id. § 20.

**19.**  "[F]rom 1901 to 1952 Congress step by step divested itself of power to govern Puerto Rico *intra-territorially.*" (italics ours) Dr. David M. Helfeld former Dean of the University of Puerto Rico Law School in a speech before the law school on March 28, 1998.

edged that "under the terms of these congressional enactments an *increasingly* large measure of self-government has been achieved." (Italics ours).

Further, § 1 of the statute provided:

Fully recognizing the principle of government by consent, this act is now adopted in the **nature of a compact**[20] so that the people of Puerto Rico may organize a government pursuant to a constitution of their own adoption.

(Emphasis ours).

Pub.L. No. 600 continued to grant Puerto Rico authority *over its surrounding waters* while extending federal legislation over these areas unless "locally inapplicable". In pertinent part, the legislation reads:

The ... bodies of water ... in and around the island of Puerto Rico ... are ... placed under the control of the government of Puerto Rico ... [and][a]ll laws of the United States for the protection and improvement of the navigable waters of the United States and the preservation of the interests of navigation and commerce, except so far as the same may be locally inapplicable, shall apply to said island and waters....

Pub.L. No. 600 § 8, 48 U.S.C. § 749.

In 1980 § 8 was amended to clarify that Puerto Rico's jurisdiction extended from the coastline of the Island seaward to a distance of "three marine leagues."

## C. DOMESTIC V. INTERNATIONAL

Clearly, Congress' acts with respect to Puerto Rico have dealt with the enlargement of self-government and the inter-relationship between Puerto Rico and the United States. However, at no time has Puerto Rico been granted any authority over international mat-

ters. The cases which have acknowledged Puerto Rico's authority to supersede federal statutes under § 8 of Pub.L. No. 600 have been essentially limited to domestic legislation in the area of worker's compensation.[21]

Puerto Rico's authority to enact legislation inconsistent with federal maritime law was explained in *Guerrido v. Alcoa S.S. Co.*, 234 F.2d 349, 355 (1st Cir.1956) where the circuit court pointed out that:

[T]he rules of the admiralty and maritime law of the United States are presently in force in the navigable waters of the United States in and around the island of Puerto Rico to the extent that they are not locally inapplicable either because [1] they were not designed to apply to Puerto Rican waters or [2] because they have been rendered inapplicable to these waters by inconsistent Puerto Rican legislation. This is not to say, of course, that Puerto Rican legislation could thus supplant a rule of maritime law which Congress in the exercise of its constitutional power has expressly made applicable to Puerto Rican waters.

This reasoning has been consistently followed both by the federal and local courts. *See Alcoa Steamship Co. v. Perez Rodriguez*, 376 F.2d 35 (1st Cir.1967) (P.R. worker's compensation supplants federal maritime law); *Reeser v. Crowley Towing & Transp. Co., Inc.*, 937 F.Supp. 144 (D.P.R.1996) (Puerto Rico's worker's compensation provides exclusive remedy to seaman injured on vessel docked in Puerto Rican territorial waters). *See also United States v. Ramirez Ferrer*, 613 F.2d 1188 (1st Cir.1980) (federal permit requirement for erecting structures in Puerto Rican navigable waters valid absent local inconsistent provisions in effect); *Lopez–Soba v. Fitzgerald*, 1992 WL 445964 (1992) (specific federal maritime laws not applicable to sunken ship found in territorial

**20.** The intent of Congress in the utilization of this phrase has opened a floodgate of debates, articles, commentaries and judicial opinions on the true meaning of the new relationship between Puerto Rico and the United States. The "true meaning" being the nature and extent of Puerto Rican sovereignty purportedly granted by Congress. *See* comprehensive summary and discussion of this issue in *Popular Democratic Party v. Commonwealth of Puerto Rico*, 24 F.Supp.2d 184, 186–93 (D.P.R.1998).

**21.** For a discussion of this issue *see i.e.,* Gustavo A. Gelpi, Jr., Maritime Law in Puerto Rico: an Anomaly in a Sea of Federal Uniformity, 26 Inter.Am.L.Rev. 251 (1992) and Salvador E. Casellas (now a judge of this Court), Federal and Commonwealth Jurisdiction in the Field of Maritime Law, 26 Rev.Col.Abog.P.R. 259 (1966).

waters due to existing local legislation); *Leon v. Transconex, Inc.*, 119 D.P.R. 102, 1987 WL 448301 (1987) (federal maritime law applicable in Puerto Rico absent Congressional mandate to the contrary).

■ However, it is axiomatic that Puerto Rico's authority over its territorial waters is not absolute. As indicated in *Guerrido*, it must yield to express Congressional intent, *see United States v. Rivera Torres*, 826 F.2d 151 (1st Cir.1987) (Federal Relations Act does not preclude application of the Clean Water Act to Puerto Rico given clear legislative wording). Furthermore, this geographical area is also subject to federal legislative measures taken under the constitutional powers of the United States.

In *Feliciano v. United States*, 297 F.Supp. 1356 (D.P.R.1969), *aff'd*, 422 F.2d 943 (1st Cir.1970) a case whereby the U.S. military occupancy of the island of Culebra off the coast of Puerto Rico was being challenged, the court determined that Congress retained the power to make laws providing for national defense **even** if those laws applied to Puerto Rican territorial waters. The court recounted the history of *Guerrido* and concluded that maritime statutes of the U.S. were applicable unless Puerto Rico legislated contrary thereto. However, the court distinguished between maritime worker's compensation and matters dealing with national defense. The court acknowledged that by its very nature, national defense cannot not be regulated by the local government.

One of the arguments utilized by the court in reaching its decision was the fact that Puerto Rico had no authority over national defense issues be it on land or territorial waters. In other words, since Puerto Rico has no control over defense matters, it cannot supplant federal legislation in this field.

The issue of Puerto Rico's authority to affect the relationship between the United States and other nations was mentioned in *Perez de la Cruz v. Crowley Towing and Transp. Co.*, 807 F.2d 1084 (1st Cir.1986). Even though the court acknowledged Puerto Rico's control over its territorial waters and its power to supplant the provisions of the Jones Act with local worker's compensation statutes, it cautioned that:

> [W]e express no opinion on the extent of Puerto Rico's territorial waters with relation to the rights of other countries. Especially, nothing herein is to be taken as diminishing the rights of the United States in the questioned waters with respect to international relations, national defense, or control over the transit of its own or foreign vessels.

*Id.* at 1088 n. 1.

Significantly, all cases which have touched upon Puerto Rico's authority over its territorial waters have been limited to matters concerning Puerto Rico's relationship vis-à-vis with the United States. None have addressed international issues or treaties which, we conclude, is a distinction *with* a substantial difference. Some of the holdings bearing on Puerto Rico's powers under the FRA appear to offer a resolution of the problem but they are largely illusory in that they do not satisfactorily answer the question of whether Congress' grant of power to Puerto Rico to supplant federal maritime law goes beyond the domestic arena in its arrangements and dealings between the Island and the United States.[22] That is to say, none of the cases to date have touched upon whether the Federal Relations Act intended to permit Puerto Rico to affect the rights and obligations of the United States under a treaty with other nations. To hold in the affirmative is to say that Puerto Rico has become, by virtue of the Federal Relations Act, a sovereign entity in the international sense.[23]

---

**22.** "With commonwealth status Puerto Rico achieved the same scope of authority over its internal affairs as is true of a state of the union." Dr. David M. Helfeld, *supra*. It is axiomatic that no state can abrogate a treaty of the United States.

**23.** "While in an international sense Puerto Rico was not a foreign country, since it was subject to the sovereignty of and was owned by the United States, it was foreign to the United States in a domestic sense, because the Island had not been incorporated into the United States, but was merely appurtenant thereto as a possession." *Downes v. Bidwell*, 182 U.S. 244, 21 S.Ct. 770, 45 L.Ed. 1088 (1901) at pp. 341–42. "The nature of this holding (in *Downes v. Bidwell*) is not generally known in either the United States or Puerto Rico. The typical American or Puerto Rican is

Based on the foregoing, this Court rules that on this issue, and this issue alone, the Congress of the United States in the enactment of Pub.L. No. 600 did not intend to vest Puerto Rico with the power to alter or affect in any way United States treaties with other nations, despite the fact that provisions of the 1910 Treaty was not expressly made applicable to Puerto Rico and despite Congress' recognition of the principle of government by consent and its adoption of the Act "in the nature of a compact." [24]

Thus, we find that under the particular facts of this case the applicable statute of limitations to plaintiff's cause of action is the two-year term provided for in the Salvage Convention of 1910 and therefore, this action was timely filed.

## IV. CONCLUSION

Based on the foregoing, the Motion to Dismiss filed by NEIL CHARLES COPPING, et al. (docket No. 49) [25] is **DENIED.**

It is further ORDERED that the Memorandum on Position of Defendants Metro Freighting and West of England on Motion to Dismiss (docket No 65) [26] is **DENIED.**

IT IS SO ORDERED.

shocked to learn that Puerto Rico has never been part of the United States in the domestic sense. It should also be unsettling to know that it is the prevalent position of the United States government, even at present, that Congress still has plenary powers over Puerto Rico, to the full extent declared in *Downes*, and that, accordingly, Puerto Rico is still a territory, possession, or chattel of the United States." José Trias Monge. Puerto Rico: The Trials of the Oldest Colony In The World. Yale University Press, p. 48 (1977).

24. Of more than passing significance on this issue is Congress' unchallenged unilateral modification of the long established policy to return to Puerto Rico the full proceeds of the tax on rum.

*See* Deficit Reduction Act of 1984, 26 U.S.C. 7652(f). As Dr. Helfeld pointed out "[T]he argument that under the Compact Congress had totally surrendered its taxing powers would have had little chance of success in the federal courts." Dr. David M. Helfeld, *supra*. Similarly, an argument that under the Compact Congress had totally surrendered its treaty making powers meets with even less success.

25. *See also* Plaintiff's Opposition (docket No. **50**); Defendants' Reply (docket No. **51**); and Plaintiff's Sur–Reply (docket No. **52**).

26. *See* Plaintiff's Opposition (docket No. **66**).